| | |
|---|---|
| LUCAS LINDSEY,<br>Individually and on behalf of all others<br>similarly situated, and derivatively on behalf of<br>ATLANTIC COAST FINANCIAL<br>CORPORATION,<br><br>          Plaintiff,<br><br>   v.<br><br>ATLANTIC COAST FINANCIAL<br>CORPORATION,<br><br>          Nominal Defendant<br><br>ATLANTIC COAST BANK,<br>BOND STREET HOLDINGS, INC.,<br>FLORIDA COMMUNITY BANK, N.A.,<br>FORREST W. SWEAT JR., CHARLES E.<br>MARTIN JR., THOMAS F. BEECKLER, G.<br>THOMAS FRANKLAND, JOHN J.<br>LINFANTE, W. ERIC PALMER, and H.<br>DENNIS WOODS,<br><br>          Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | IN THE CIRCUIT COURT<br><br>FOR<br><br>BALTIMORE CITY, MARYLAND<br><br>Case No. 24C13001305<br><br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff, Lucas Lindsey ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, and derivatively on behalf of Atlantic Coast Financial Corporation, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to it, which are alleged upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.     Plaintiff brings this shareholder and derivative class action on behalf of Atlantic Coast Financial Corporation, and on behalf of himself and all other public shareholders of Atlantic

Coast Financial Corporation and its savings bank subsidiary, Atlantic Coast Bank (collectively "Atlantic" or the "Company"), against Atlantic, its Board of Directors (the "Board" or the "Individual Defendants"), Bond Street Holdings, Inc. ("Bond"), and Florida Community Bank, N.A. ("Florida Community Bank") (collectively, the "Defendants"), arising out of a transaction in which Bond will acquire each share of Atlantic's common stock for $5.00 per share (the "Proposed Acquisition" or the "Merger"). Of this amount, $2.00 per share will be held in an escrow account and will be available to cover losses from stockholder claims for one year following the closing of the Merger or until the final resolution of such claims, if later. Closing of the Merger is expected to occur by the end of the second quarter of 2013.

2.      In direct contrast to the significant evidence of the Company's ability to continue to execute on its strategic plan, grow revenue and trim its economic losses over the past year, the Proposed Acquisition is the product of a hopelessly flawed process designed to ensure the sale of Atlantic to Bond on terms preferential to Defendants and to subvert the interests of Plaintiff and the other public stockholders of the Company.

3.      Analyst expectations, financial performance and historical trading prices all establish that the consideration to be received by Atlantic shareholders in the Proposed Acquisition is unfair and inadequate. Significantly, of the $5.00 per share "purchase price," only $3 is guaranteed to Atlantic shareholders as $2.00 will be held in an escrow account and will be available to cover losses from stockholder claims for one year or until the final resolution of such claims, if later. In fact, Atlantic was trading well above $3.00 per share ($3.55 per share) on February 25, 2013, one day prior to the Merger announcement, as high as $3.71 per share on January 25, 2013 and as high as $10.32 per share as recently as March 11, 2011. Moreover, at least one Yahoo! Finance analyst has

1

set a $4.00 per share target price for the Company *while Atlantic's reported book value per share for the instant quarter is an impressive $16.96 per share, more than 3x the "purchase price."*

4. The consideration offered in the Proposed Acquisition is an illusory "premium" and/or no premium at all. Pursuant to the Merger Agreement, $2 is being held back to provide indemnity for Atlantic stockholder claims – claims that the Company knew or should have reasonably known were likely, particularly given the low price being offered when compared with the $16.96 book value per share and the $10.00 per share paid by many current Atlantic stockholders in the 2010 offering. Moreover, this $2 "holdback" is not related to any earnout or similar situation where there is risk-sharing between buyer and seller. Under these circumstances, using anything but the $3 guaranteed payment to assess the fairness of the consideration is inappropriate, and at the time the Merger Agreement was approved by the Board, the $3 guaranteed payment actually represented over a 10% *discount* to the 10-day average trading price of $3.36 cited in the Company's press releases.

5. The $2.00 holdback for stockholder claims is highly unusual in a public company M&A transaction generally and is particularly inappropriate under the current circumstances, where Atlantic stockholders have no right to seek judicial appraisal of the value of their Atlantic shares if they are dissatisfied with the price being offered. Under Maryland law (the law under which Atlantic is incorporated), appraisal rights are generally not available to stockholders of companies whose shares of stock trade on a national exchange. Thus, in the absence of appraisal rights, objecting Atlantic stockholders have only one avenue of redress – to file suit against the Company. The $2.00 holdback, however, is specifically designed to deter a lawsuit and creates the exact and highly prejudicial dilemma sought by Defendants - a shareholder claim may adversely

impact the consideration ultimately received. The clear intent of this provision is to coerce Atlantic shareholders into accepting Bond's terms without complaint.

6.      *Additionally, nearly 25% of the Company's Board openly disagree with the Company's decision to enter into the agreed upon Merger with Bond.* Significantly, on March 26, 2013, board members Jay Sidhu ("Sidhu") and Bhanu Choudhrie ("Choudhrie") delivered a letter to the Board of Directors in which they state that they intend to vote the shares of Atlantic owned by them against the Merger when it is brought to a stockholder vote (the "Letter"). In the Letter, Sidhu and Choudhrie describe their concerns regarding the Merger, the fairness of the consideration being offered to the Atlantic Coast Financial's stockholders and the process undertaken by the Board of Directors in considering and approving the Merger and Merger Agreement.

7.      In addition and pursuant to the Letter, Sidhu and Choudhrie expressed their belief that a recapitalized Atlantic would provide better value to the Company's stockholders than the Merger and that the changes in the Board of Directors and implementation of other initiatives that have been proposed over the past year would provide the Company's stockholders with much better options in the future, either through a sale on better terms than the Merger or by operating Atlantic as an independent public company.

8.      Additionally, on March 27, 2013, Atlantic filed a Schedule 14A Proxy Statement (the "Proxy") with the SEC. The Proxy contains numerous material misstatements and omissions. As explained below, the Proxy exposes some details of the highly conflicted sales process, but fails to disclose material facts concerning the Proposed Acquisition – preventing shareholders from casting an informed vote for or against the Proposed Acquisition. For example, the Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process for Atlantic; (b) Atlantic's financial projections; and (c) the data and inputs underlying the financial

valuation exercises that purport to support the so-called "fairness opinion" provided by Stifel, Nicolaus & Company, Incorporated, an affiliate of Keefe, Bruyette & Woods ("KBW"), its financial advisor.   Moreover, review of the Proxy further establishes that the price offered to Atlantic shareholders is woefully inadequate and cannot be supported by a properly prepared valuation of the Company.

9.       In approving the Proposed Acquisition, however, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell to Bond without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Acquisition to benefit themselves and/or without regard for Atlantic's public shareholders.  Moreover, as alleged further herein, Bond aided and abetted the Individual Defendants' breaches of fiduciary duty.  Accordingly, this action seeks to enjoin the shareholder vote on the Proposed Acquisition and compel the Individual Defendants to properly exercise their fiduciary duties to Atlantic's shareholders.

## PARTIES

10.      Plaintiff has been a shareholder of Atlantic Coast Financial Corporation at all times relevant hereto has been, and continues to be a shareholder of Atlantic Coast Financial Corporation.

11.      Defendant Forrest W. Sweat Jr. ("Sweat") is and has been the Vice Chairman of the Atlantic Board at all times relevant hereto.  Sweat is a partner in the law firm of Walker & Sweat, Waycross, Georgia.  According to the Company's Proxy statement, Sweat is the beneficial owner of 24,149 shares of Atlantic stock including 4,673 stock options.

12.      Defendant G. Thomas Frankland ("Frankland") was appointed to the Board of Directors in August 2010 and was named Interim President and Chief Executive Officer of Atlantic in October 2010 and assumed the permanent role of President and Chief Executive Officer in May

4

2011. According to the Company's Proxy statement, Frankland is the beneficial owner of 18,454 shares of Atlantic stock, including 5,000 stock options.

13.     Defendant John J. Linfante ("Linfante") has served as Chairman of the Atlantic Board at all times relevant hereto.

14.     Defendant H. Dennis Woods ("Woods") has been a member of the Atlantic Board at all times relevant hereto. Woods is a retired employee of CSX Transportation, Inc., Waycross, Georgia, where he worked from 1964 until 2005 with Charles E. Martin Jr. ("Martin"). According to the Company's Proxy statement, Woods is the beneficial owner of 11,530 shares of Atlantic stock including 4,673 stock options.

15.     Defendant Martin has served as a director of Atlantic and its predecessor, Atlantic Coast Federal Credit Union, since 1982. Martin is a retired employee of CSX Transportation, Inc. where he worked with Woods. Martin was a long-time resident of Waycross, Georgia. According to the Company's Proxy statement, Martin is the beneficial owner of 17,786 shares of Atlantic stock including 4,673 stock options.

16.     Defendant Thomas F. Beeckler ("Beeckler") has served as a Director of Atlantic at all times relevant hereto. According to the Company's Proxy statement, Beeckler is the beneficial owner of 18,638 shares of Atlantic stock including 4,673 stock options.

17.     Defendant W. Eric Palmer ("Palmer") has served as a Director of the Company at all times relevant hereto. Palmer was associated with Atlantic Coast Federal Credit Union as a member of its Credit Union Service Organization and its Community Advisory Board. According to the Company's Proxy statement, Palmer is the beneficial owner of 8,762 shares of Atlantic stock including 4,673 stock options.

18.    Defendant Atlantic Coast Financial Corporation operates as the bank holding company for Atlantic Coast Bank that provides various banking services to individual and business customers primarily in northeastern Florida and southeastern Georgia. Atlantic Coast Financial Corporation was founded in 1939 and is based in Jacksonville, Florida and is incorporated in the state of Maryland. Atlantic Coast Financial Corporation's stock is traded on the Nasdaq under the symbol "ACFC."

19.    Defendant Atlantic Coast Bank is a savings subsidiary of Atlantic.

20.    Defendant Bond, Florida's fifth largest independent bank, was formed in 2009 and is headquartered in South Florida. On February 21, 2013, the Federal Reserve Bank of Atlanta (the "Federal Reserve") approved Bond's request to execute an agreement with the Company to acquire more than 10% of the Company's common stock.

21.    Defendant Florida Community Bank is a bank subsidiary of Bond.

22.    Defendants named in paragraphs 11-17 are referred to herein as "Individual Defendants" or "Director Defendants."

23.    By reason of their positions as officers and/or directors of the Company, the Individual Defendants named above are in a fiduciary relationship with Plaintiff and the other public shareholders of Atlantic and owe them a duty of candor and a duty to maximize shareholder value, as set forth in further detail herein.

24.    Jay Sidhu was named Executive Chairman of Atlantic in September 2010 and assumed the role of non-executive Chairman of the Company's Board in May 2011. Sidhu resigned from his position as non-executive Chairman effective April 30, 3012, citing concerns that the board was failing to act to mitigate risks. Sidhu signed a three-year consulting agreement with Atlantic Coast Financial in 2011 that is still active. According to the agreement, he provides advice on

operating, personnel, business and tax planning strategies in addition to assistance on future capital-raising initiatives. He will receive $250,000 over the term of the agreement and is entitled to an incentive bonus of $500,000 if he helps the bank reach certain goals. According to the Company's April 11, 2012, Schedule 14A that was filed with the SEC, Sidhu is the beneficial owner of 57,072 shares of Atlantic stock, including 3,920 stock options, which together represent 2.1% of all outstanding Company shares. Sidhu voted against the Proposed Acquisition.

25.    Bhanu Choudhrie has been a member of the Atlantic Board at all times relevant hereto. According to the Company's Proxy statement, Choudhrie is the beneficial owner of 120,000 shares of Atlantic stock that equal 4.4% of all outstanding shares of Atlantic stock. Choudhrie voted against the Proposed Acquisition.

### JURISDICTION AND VENUE

26.    The damages suffered and sought to be recovered by Plaintiff and the Class are in excess of the jurisdictional minimum of this Court. The exact amount of damages suffered by Plaintiff and the Class cannot be precisely determined at this point.

27.    This Court has personal jurisdiction over the Defendants pursuant to Md. Cts. & Jud. Proc. § 6-103(b) inasmuch as Defendants directly or by agents transact business in Maryland, contract to supply goods in Maryland, caused tortious injury in Maryland by an act or omission outside the State while regularly doing and/or soliciting business, engaging in other persistent course of conduct in the State, and/or deriving substantial revenue from goods produced or consumed in Maryland. Furthermore, defendant Atlantic Coast Financial Corporation is incorporated in Maryland, and each of the Individual Defendants is a director of a public company that is incorporated in Maryland.

28.      Venue is proper in this Court pursuant to Md. Cts. & Jud. Proc. § 6-201 (a) and (b),

inasmuch as Atlantic Coast Financial Corporation is incorporated in Maryland, and maintains its

registered agent in Baltimore City, and there are multiple defendants with no single venue

applicable, and thus can be sued for damages in any Maryland county or Baltimore City.

## SUBSTANTIVE ALLEGATIONS

29.      On February 26, 2013, Atlantic issued a press release and filed it with the United

States Securities and Exchange Commission ("SEC") wherein it disclosed the entry by Atlantic and

Bond into a definitive agreement under which Bond will acquire Atlantic in a cash transaction (the

"Merger Agreement"). The joint press release provides, in relevant part, as follows:

JACKSONVILLE, Fla.--(BUSINESS WIRE)--February 26, 2013--Atlantic Coast
Financial Corporation (the "Company") (NASDAQ: ACFC), the holding company
for Atlantic Coast Bank (the "Bank"), today announced a strategic transaction that
will achieve immediate enhanced value for all stockholders with respect to the
present value of their investment, as well as a financially strong banking platform,
and a competitive community banking organization that is well positioned to meet
the needs of its customers and communities for the long term.

Specifically, the Company has entered into a definitive merger agreement with Bond
Street Holdings, Inc. ("Bond Street") under which the Company will merge into
Bond Street, a community-oriented bank holding company with $3.2 billion in total
assets that operates 41 community banking branches along both Florida coasts and in
the Orlando area. Upon completion of that transaction, Atlantic Coast Bank will
merge into Florida Community Bank, N.A., Bond Street's banking subsidiary.

As a result of this strategic merger agreement, the Company's stockholders will
receive $5.00 per share in cash for each common share owned. The $5.00 per share
merger consideration to be realized by the Company's stockholders represents a
premium of approximately 49% to the Company's average stock price of $3.36 over
the 10-day period ended February 25, 2013. Of the total transaction price of $5.00,
$2.00 will be held in an escrow account and will be available to cover losses from
stockholder claims for one year or until the final resolution of such claims, if later.
The transaction is expected to be completed by the end of the second quarter of 2013,
subject to customary conditions, including regulatory approvals and the approval of
Company stockholders.

G. Thomas Frankland, President and Chief Executive Officer of the Company, said,
"This transaction is a win for our stockholders, a win for our customers and a win for

8

our banking franchise. This strategic business combination significantly enhances our combined abilities to be one of the financially strongest and most competitive community banking organizations in the northeast Florida and southeast Georgia markets. This transaction is an important and meaningful opportunity for our stockholders, our customers and our communities. The keys to community banking going forward are the resources that an organization can dedicate to build its customer market potential, the soundness of the capital and operating capabilities of its platform, and its expertise about its markets and products to meet the financial services needs of its customers. We are confident that this merger is a highly attractive strategic alignment. Its completion will fulfill as well the capital mandate we have received from our regulators."

The Company stated that its Board of Directors and the Strategic Alternatives Committee of the Board, with the assistance of the Committee's independent financial advisor, Stifel, Nicolaus & Company, Incorporated, an affiliate of Keefe, Bruyette & Woods, Inc., (a Stifel Financial Corp Company), have considered various strategic alternatives for more than a year, including a recapitalization in the form of a rights offering as well as an outright merger transaction. In evaluating its options, the Committee and the Board considered the relative risks involved with the alternatives, along with the Company's goal of maximizing the return to stockholders. These risks include the prospects of approval by regulators for successful completion of other alternatives, the effectiveness of each option in gaining full compliance with the Consent Order issued by the Office of the Comptroller of the Currency under which the Bank currently operates, the Bank's continued exposure to credit, market, economic, and interest rate risks, as well as ongoing earnings pressure from the Company's asset quality and wholesale debt. Considering all these factors, the Board of Directors voted to proceed with the merger alternative, determining that it will provide stockholders with an enhanced return given market and business conditions, remove the prospects of future dilution to stockholders, and eliminate the operational and regulatory risks associated with a recapitalization.

"We are excited by the prospects of growing our bank platform with the addition of Atlantic Coast Bank and the opportunities we foresee as we move together to expand in the Jacksonville area as well as the Southeast Georgia markets," added Kent Ellert, President and Chief Executive Officer of Florida Community Bank. "This acquisition will enhance our Florida footprint significantly by giving us attractive visibility in the state's fourth largest metro area and will provide a substantial foundation for us to build a commercial lending team to spur future growth -- precisely as we have done with the eight successful acquisitions we have previously completed. We look forward to having Atlantic Coast Bank on our team, building on its tradition and many great qualities, and together creating an even stronger community bank for customers."

When the transaction is completed, Florida Community Bank will become the fourth largest bank headquartered in Florida, with almost $4 billion in assets and 53 locations along both Florida coasts and in Southeast Georgia.

30.     Analyst expectations, financial performance and historical trading prices all establish that the consideration to be received by Atlantic shareholders in the Proposed Acquisition is unfair and inadequate. Significantly, of the $5.00 per share "purchase price," only $3.00 is guaranteed to Atlantic shareholders as $2.00 will be held in an escrow account and will be available to cover losses from stockholder claims for one year or until the final resolution of such claims, if later. In fact, Atlantic was trading above $3.00 per share ($3.55 per share) on February 25, 2013, one day prior to the Merger announcement, as high as $3.71 per share on January 25, 2013 and as high as $10.32 per share as recently as March 11, 2011. Moreover, at least one Yahoo! Finance analyst has set a $4.00 per share target price for the Company while Atlantic's reported book value per share for the instant quarter is a whopping $16.96 per share, more than 3x the "purchase price."

31.     The consideration offered in the Proposed Acquisition is an illusory "premium" and/or no premium at all. Pursuant to the Merger Agreement, $2.00 is being held back to provide indemnity for Atlantic stockholder claims -- claims that the Company knew or should have reasonably known were likely, particularly given the low price being offered when compared with the $16.96 book value per share and the $10.00 per share paid by many current Atlantic stockholders in the 2010 offering. Moreover, this $2.00 "holdback" is not related to any earnout or similar situation where there is risk-sharing between buyer and seller. Under these circumstances, using anything but the $3.00 guaranteed payment to assess the fairness of the consideration is inappropriate, and at the time the Merger Agreement was approved by the Board, the $3.00 guaranteed payment actually represented over a 10% *discount* to the 10-day average trading price of $3.36 cited in the company's press releases.

32.     The $2.00 holdback for stockholder claims is highly unusual in a public company M&A transaction generally and is particularly inappropriate under the current circumstances, where Atlantic stockholders have no right to seek judicial appraisal of the value of their Atlantic shares if they are dissatisfied with the price being offered. Under Maryland law (the law under which Atlantic is incorporated), appraisal rights are generally not available to stockholders of companies whose shares of stock trade on a national exchange. Thus, in the absence of appraisal rights, objecting Atlantic stockholders have only one avenue of redress -- to file suit against the Company. The $2.00 holdback, however, is specifically designed to deter a lawsuit and creates the exact and highly prejudicial dilemma sought by Defendants - a shareholder claim may adversely impact the consideration ultimately received. The clear intent of this provision is to coerce Atlantic shareholders into accepting Bond's terms without complaint.

33.     Moreover, the Company has seen its financial performance improve, trimming its losses considerably in the year 2012. For example, on May 1, 2012, Atlantic reported a net loss of $1.7 million or $0.69 per diluted share, down from a net loss of $3.4 million or $1.36 per diluted share in the year-earlier quarter and down on a linked-quarter basis from a net loss of $4.0 million or $1.61 for the three months ended December 31, 2011. Commenting on the first quarter results, Frankland said,

> We are encouraged by the Company's first quarter results, which reflected an improvement in credit quality and the impact of our initiatives to reduce non-interest expenses. This resulted in an ongoing reduction in net loss concurrent with a reduction in non-performing assets [..] we continue to be encouraged by the strength of our banking operations, as well as our mortgage warehouse lending and small business initiatives. Also, improved liquidity in the market for the sale of non-performing assets yielded positive results this quarter. Considering these mixed currents, our board and management team remain committed to our strategies of reducing operating expenses, aggressively improving credit quality and developing Atlantic Coast Bank's retail community banking model, which we believe will continue to improve our financial results in the future.

11

34.     In reporting Q2 2012 financial and operating results on August 30, 2012, Frankland

was again optimistic in stating:

> Following the improvements we cited in our first quarter report, we were pleased to
> see the Company continue to make headway in several key areas during the second
> quarter. Specifically, we witnessed further progress in reducing non-performing
> assets and lowering deposit costs. We also reduced non-interest expense compared
> with the year-earlier quarter and for the first half of the year versus the same period
> in 2011. Additionally, we are encouraged by the efforts of our retail banking team as
> it continues to show good progress in lower cost deposit production, as well as our
> warehouse and small business lending teams as they continue to build loan income.
> Lastly, our operations team has been successful in pursuing cost initiatives that will
> further reduce our non-interest expense.

35.     The Company issued its Q3 2012 financial and operating results press release on

October 6, 2012, wherein Frankland stated again that Atlantic was "pleased to report additional

reductions in our non-performing asset levels – now over a third less than the amounts at the

beginning of 2012. Our strategy to be opportunistic in dealing with problem loans has proven

effective. Also, our warehouse lending had a strong quarter with the end-of-quarter balance

increasing by 41% to $72 million from the second quarter-end amount, and our retail banking team

performed well with their deposit retention and growth campaign. Like many banks, our net interest

income is softening given the extended low interest rate environment."

36.     Then on March 4, 2013, the Company was again pleased to report that its net loss for

the quarter of $0.3 million or $0.12 per diluted share was far improved compared to a net loss of

$4.0 million or $1.61 per diluted share in the year-earlier quarter and a net loss of $1.7 million or

$0.66 per diluted share in the third quarter of 2012. For full year 2012, Atlantic's net loss totaled

$6.7 million or $2.67 per diluted share compared with a net loss for 2011 of $10.3 million or $4.13

per diluted share. Business is clearly improving.

37.     Regardless of the Company being able to successfully trim net losses by

approximately $3.6 million in 2012, there appears to be a serious disagreement over the direction

and management of the Company amongst the Individual Defendants.  Defendants Sidhu and Choudrie are "determined to see a positive change" made to the bank holding company, and view a change on the Board of Directors as the first step toward that end.  Sidhu and Choudrie voiced these concerns in a letter to the Board on February 20, 2013, wherein they stated, "To our amazement, the majority of the Board has consistently failed to act to mitigate or significantly reduce the risks facing the corporation and follow prudent safety and sound banking practices, in spite of several plans put forward by some directors."  In the letter, Sidhu notes that Chairman of the Board, defendant Linfante, refused to call a meeting to discuss matters relating to suggestions that included a cost reduction/productivity improvement plan; a structured and comprehensive risk assessment, mitigation plan and stress testing process; and a strategic and tactical profit improvement and turnaround plan.

38.     Moreover, in the letter, Sidhu and Choudrie identified three individuals for nomination to the Board at the upcoming annual meeting.  In an interview with the Jacksonville Business Journal, Sidhu stated that a stronger board would lead to greater shareholder confidence and, further, "We want to have a very high quality board[.]  The board that we have now, they listen but they don't want to act.  They don't want to rock the boat.  We don't want to rock the boat either.  We'd like to see the boat sailing successfully."

39.     Atlantic's Board has been unable to agree on the direction of the Company for quite some time, during which, prior Atlantic directors have resigned.  For example, in June 2012, ex-Atlantic Board member Charles Carey ("Carey") resigned from the board, citing as his reasons governance concerns, business planning and execution and teamwork concerns.  In a letter date June 2, 2012, Carey stated, "In the limited time I have served on the board it has become apparent to me that, given the events that have transpired, and current circumstances at ACFC, I will be unable to

13

effectively serve as a board member [...] Although other directors and I have made repeated requests over the last few months for a credible business plan, no such plan has been shared with us [...] The Board's ability to effectively manage the business has been significantly thwarted by the polarization of Board members and the contentious nature of interactions among directors."

40.     One of the concerns raised in Carey's resignation letter related to stock purchases defendant Frankland made in December 2011. Frankland acquired 7,046 additional shares of stock for an aggregate purchase price of $10,143. In his letter to the Board, Carey stated that the Board failed to fully implement the recommendations of legal counsel relating to the stock purchases. Sidhu said he agreed with Carey's opinion. "The stock purchases were absolutely an inappropriate thing to do," Sidhu said. "He was privy to insider information and you just don't buy the stock." Sidhu added about the Board, "They're just not focused on what it takes to turn a bank around. They're not making the tough decisions."

41.     The in-fighting between Frankland and Sidhu is at an all time high. Sidhu joined the Company as the Executive Chairman in 2010 and recruited Frankland to join as Interim President and CEO to help complete the conversion to a fully public company. When the Board appointed Frankland to the top executive role permanently in May 2011, Sidhu's executive role was eliminated and he was named Chairman of the Board. Current Board Chairman Linfante has called Sidhu a dissident board member and said he believes that one of the issues is that Sidhu lost control when his executive role was eliminated. In a June 15, 2012, Jacksonville Business Journal article, *Execs squabble over how to save Atlantic Coast Financial*, Linfante said of Sidhu, "He wanted to dominate. His operating style is one of bullying instead of agreeing by consensus."

42.     Sidhu called those claims silly and outrageous. "He [Linfante] is a 20-year friend of Tom Frankland and puts his personal and his friends' interests ahead of shareholders," Sidhu wrote

in an email. "Bhanu Choudhrie and I are the largest shareholders on the board and we just want the

bank to rebuild shareholder value destroyed by poor decisions of a majority of board members that

have destroyed $60 million in shareholder value over the past five years." Sidhu signed a three-year

consulting agreement with Atlantic Coast Financial in 2011 that is still active. According to the

agreement, he provides advice on operating, personnel, business and tax planning strategies in

addition to assistance on future capital-raising initiatives. He will receive $250,000 over the term of

the agreement and is entitled to an incentive bonus of $500,000 if he helps the bank reach certain

goals.

43.     On February 21, 2013, the Federal Reserve approved Bond's request to execute an

agreement with the Company to acquire more than 10% of the Company's common stock. Bond's

considerable Atlantic stock holdings, together with the share ownership of Atlantic's directors and

executive officers (less those shares owned by defendants Sidhu and Choudhrie who do not intend to

vote their shares in favor of the Merger) equal approximately 15% of all outstanding Atlantic shares

that have already been committed in support of the Merger before a single common shareholder has

had an opportunity to review the Merger Agreement.

44.     Significantly, on March 26, 2013, defendants Sidhu and Choudhrie delivered a letter

to the Board of Directors in which they state that they intend to vote the shares of Atlantic Coast

Financial owned by them against the Merger when it is brought to a stockholder vote (the "Letter").

In the Letter, Sidhu and Choudhrie also describe their concerns regarding the Merger, the fairness of

the consideration being offered to the Atlantic Coast Financial's stockholders, the process

undertaken by the Board of Directors in considering and approving the Merger and Merger

Agreement and related matters.

45.    In addition and pursuant to the Letter, Sidhu and Choudhrie express their belief that a recapitalized Atlantic would provide better value to the Company's stockholders than the Merger and that the changes in the Board of Directors and implementation of other initiatives that have been proposed over the past year would provide the Company's stockholders with much better options in the future, either through a sale on better terms than the Merger or by operating Atlantic as an independent public company.    Sidhu and Choudhrie also stated that the Board has consistently failed to act to mitigate or significantly reduce the risks facing Atlantic and follow prudent safety and sound banking practices, in spite of several plans put forward by certain directors. The Letter, reads in its entirety, is as follows:

March 26, 2013

ATLANTIC COAST FINANCIAL CORPORATION
10151 Deerwood Park Boulevard
Building 200, Suite 100
Jacksonville, Florida 32256

Attention:            Board of Directors

Gentlemen:

We are writing to you to express our serious concerns regarding the proposed merger with Bond Street Holdings. I am writing this letter on behalf of myself and my fellow director Bhanu Choudhrie. As you know, in addition to our service as directors of ACFC, we are also significant ACFC stockholders and are writing this letter to you in that capacity. As of this date, we collectively own approximately 6.6% of ACFC's voting common stock (177,072 shares). We do not believe that the terms agreed to by the ACFC Board of Directors, including the price being offered, are fair to or in the best interest of ACFC's stockholders. We also do not believe that the process the Board followed in considering and approving the merger was adequate. We believe that a recapitalized ACFC will provide much better value to ACFC's stockholders and that changes in Board membership and implementing other initiatives we and others have proposed over the past year will provide ACFC stockholders with much better options in the future, either through a sale on better terms than Bond Street is offering or as an independent public company.

As you know, we opposed the proposed Bond Street transaction in our capacity as directors. As stockholders, we also oppose the transaction and we intend to vote our ACFC shares against the proposal when it is brought to an ACFC stockholder vote. Below we provide additional detail regarding our key concerns with the Bond Street terms and the Board's process in approving the proposed Bond Street transaction. We urge you to reconsider the Bond Street transaction or seek a much higher and fair price, or fully consider and pursue our recapitalization proposal and move forward with calling and holding the 2013 Annual Meeting so that ACFC can elect new directors and create value for stockholders.

As an initial matter, we take issue with ACFC's public characterization that the price being offered by Bond Street represents any "premium" to ACFC's pre-announcement trading price and any enhanced value for ACFC stockholders. This is not a $5 per share deal. Only the $3 payment is guaranteed, so fully 40% of the consideration payable to ACFC stockholders is contingent consideration. And the contingency is not related to any earnout or similar situation where there is risk-sharing between buyer and seller may be understandable. Here, the additional $2 is being held back to provide indemnity for ACFC stockholder claims – claims that you knew or should have known were likely, particularly given the low price being offered when compared with the $16.96 book value per share and the $10.00 per share paid by many current ACFC stockholders in the 2010 offering. Under these circumstances, using anything but the $3 guaranteed payment to assess the fairness of the consideration is inappropriate, and at the time the merger agreement was approved by the Board, the $3 guaranteed payment actually represented over a 10% *discount* to the 10-day average trading price of $3.36 cited in the company's press releases.

The $2 holdback for stockholder claims is of great concern to us, as we believe it is likely to have a coercive effect on ACFC stockholders. We believe that this is not a common term in public company M&A transactions generally and it seems to us to be particularly inappropriate under the current circumstances, where ACFC stockholders will have no right to dissent from the merger and seek judicial appraisal of the value of their ACFC shares if they are dissatisfied with the price being offered. In the absence of appraisal rights, objecting ACFC stockholders have only one avenue of redress – filing suit against the company. But a holdback like this that is specifically designed to apply if an ACFC stockholder sues creates an impossible dilemma for stockholders, because any claims they might bring could adversely impact the consideration they ultimately receive, as the costs, expenses and other "losses" incurred by ACFC or Bond Street are charged against the $2 holdback. In a worst-case scenario, stockholders would pay twice as a result of legitimately exercising their legal rights – first, for their own legal fees to bring an action against ACFC and, second, by indemnifying Bond Street through a reduction in the $2 per share holdback for ACFC's and Bond Street's costs, expenses and other "losses." The effect is that stockholders can be penalized for exercising their legal rights, and we believe the clear intent of this provision is to coerce them into accepting the Bond Street terms without complaint.

17

The Board's process in approving the $2 holdback is particularly troubling to us. This is an essential part of the transaction -- as it makes fully 40% of the consideration payable to ACFC stockholders contingent -- yet none of the material terms of the holdback were finalized at the time the Board approved the Merger. All of those terms are apparently going to be included in an escrow agreement at some point, but that agreement was not considered or approved by the Board when the Board approved the merger because that agreement did not yet exist. How could the Board be fully-informed as to the potential consequences of the holdback when it made its determination that the transaction was in the best interests of ACFC's stockholders if the material terms of that holdback had not yet been negotiated and finalized? The only information considered by the Board consisted of a "Summary Terms of Escrow Agreement" that is attached to the merger agreement. Did the Board realize how the remarkably broad concept of "losses" described in that summary would be carried over to a definitive agreement?

We also believe that the Bond Street-favorable deal protection provisions effectively preclude other potential acquisition partners from submitting alternative proposals and could fundamentally hinder any possible recapitalization of ACFC. In particular, we are troubled by the $650,000 termination fee payable by ACFC to Bond Street in the event ACFC pursues any significant alternative transaction. This fee is equal to approximately 8.25% of the guaranteed $3 consideration payable to ACFC stockholders, which we believe is much higher than typical termination fees. In addition, we are concerned with the 25% "change of control" threshold that triggers the obligation to pay Bond Street, which could impact any capital-raising effort in the event ACFC stockholders choose not to approve the Bond Street merger and the company, by necessity, sells additional equity. In our opinion, the fairness opinion provided by Stifel is totally inadequate. You are aware that Bond Street's Chairman Dan Healy was also a board member of a company Stifel was acquiring. They should have resigned from this engagement due to an obvious appearance of conflict. The ACFC Board has, in essence, given an option to Bond Street for a very attractive acquisition of ACFC and even found a way to potentially pay Bond Street for this option through the inclusion of the break up fee.

We also believe that the company's assertions that the Board and the Strategic Alternatives Committee adequately considered alternative courses and, in particular, a recapitalization involving a rights offering do not satisfactorily represent the Board's and Committee's process. Rather than continue any dialogue regarding a recapitalization, the Board refused to give any real consideration to any alternative other than Bond Street and, in our view, hurriedly approved and signed the merger agreement after receiving our proposal regarding changes to the Board and our public statements regarding our recommended actions toward increasing stockholder value.

As we indicated in our prior letter to the Board, we believe ACFC can be made profitable over the next few quarters, credit can be expected to experience continued, gradual improvement, risks can be effectively managed, capital can be raised at

18

market price, some or possibly all of the Deferred Tax Asset can be realized over a period of time and stockholder value can be created either thru a sale at a future date at a reasonable price or the company can continue to operate independently and grow in the Jacksonville area. We do not believe the Bond Street transaction, as announced, is in the best interests of ACFC stockholders and expect that stockholders will not approve the proposal. The lawsuit already filed regarding the transaction is indicative of stockholder dissatisfaction with the merger. We call upon the entire Board to take immediate action to consider other alternatives, including the recapitalization plan we have previously discussed with the Board, and avoid further delays and costs the company will incur for a transaction that we believe will not be completed. Also, the Board should immediately move forward in calling the 2013 annual shareholder meeting of ACFC so the stockholders can elect new directors and move forward with intensity to create substantial value for all stockholders. We hope that you will recognize that we only want to achieve what is the best for ACFC and its stockholders.

Sincerely,

/s/ Jay S. Sidhu

Jay S. Sidhu

Cc:  Bhanu Choudhrie

46.    On March 27, 2013, Atlantic issued a tersely written one paragraph response to the Letter which failed to substantively address any of Sidhu and Choudhrie's concerns regarding, (i) the process by which the Merger was entered into, (ii) the consideration payable to Atlantic shareholders and the attendant $2 holdback, (iii) the lack of appraisal rights for Atlantic shareholders, (iv) the size of the termination fee, and/or (v) any potential conflicts of interest that may be present other than to reiterate that, in the opinion of the Board, approving the Merger is in the best interests of the Company's shareholders.

47.    Support for the Proposed Acquisition on the Nasdaq, where ACFC is publicly traded, is low. When the "$5" per share buyout was announced, Atlantic's stock was trading at $3.54. Shortly after the Merger announcement, ACFC shares spiked to as high as $4.88 per share. However, since the terms of the deal, and in particular the $2 per share holdback, have come into

19

focus, the price of Atlantic's stock has tumbled to $4.42 per share as of April 1, 2013. Stated Neal Greenberg of *Seeking Alpha*, "It seems to me that any price currently above $3.50-$3.75 for ACFC common stock seems like a gamble, as what part of that $2 to be returned to you, after at least one year, remains very unsure."

48.   Moreover, the $2.00 "holdback," and the explanations therefore, remain vague and ever changing. According to the Proxy, a $2.00 holdback, in some form, has been discussed as far back as June 2012. At that time, the $2.00 was discussed as a contingent value right ("CVR") based on "future asset quality performance during a five year period." Proxy at 22. In fact, Bond's early indication of interest, in November 2012, contemplated a similar $2.00 CVR based on future asset performance. Proxy at 23.

49.   It soon became clear, however, that the Board would not reach consensus with respect to the direction of the Company. Indeed, the Proxy notes that in January 2013, the Board was practically deadlocked on proceeding on parallel tracks with Bond and the Sidhu/ Choudhrie recapitalization plan, voting 5-4 against. Proxy at 23. Thereafter, in February 2013, the $2.00 CVR was reconstituted as an amount to be held in escrow and "payable subject to the satisfaction of certain conditions." Specifically, "the escrowed funds would be payable ... following final resolution of all stockholder claims that are brought within one year following the closing of the merger, and would be reduced by the payment, if any to Bond Street of an amount necessary to cover any losses incurred in connection with such claims...." Proxy at 24.

50.   The Proxy fails to give any explanation for the change in structure from a $2.00 CVR tied to asset performance to a $2.00 escrow tied to stockholder claims relating to the merger, including whether the $2.00 CVR related to asset performance was subsumed within or retracted from the final $3.00 offer. Clearly, a CVR tied to asset performance has absolutely nothing to do

with an escrowed amount to cover stockholder claims. The Company fails to provide any disclosure on this material point.

51.     As such, the Proposed Acquisition will allow Bond to purchase Atlantic at an unfairly low price while availing itself of Atlantic's significant value and upside or long-term potential.

### PRECLUSIVE DEAL PROTECTION MECHANISMS

52.     The Merger Agreement contains certain provisions that unduly benefit Bond by making an alternative transaction either prohibitively expensive or otherwise impossible. Here, for example, the Merger Agreement contains a termination fee provision that requires Atlantic to pay $650,000.00 to Bond if the Merger Agreement is terminated under certain circumstances. For instance, under one scenario, Atlantic must pay this fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement. This fee is equal to approximately 8.25% of the guaranteed $3 consideration payable to Atlantic stockholder.

53.     In contrast, the Merger Agreement does not require Bond to pay a reciprocal termination fee to Atlantic under *any* circumstances.

54.     The Merger Agreement also contains a "no shop" provision that restricts Atlantic from considering alternative acquisition proposals by, *inter alia,* constraining Atlantic's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from soliciting any alternative proposal after a defined time period, but permits the Board to consider a *"bona fide Acquisition Proposal"* if it constitutes or is reasonably calculated to lead to a *"Superior Proposal"* as defined in the Merger Agreement.

55.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, Defendants agreed to provide Bond information in order to match any

21

other offer, thus providing Bond access to the unsolicited bidder's financial information and giving Bond the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Bond.

## THE PRICE IS INADEQUATE

56.     As set forth herein, the only guaranteed money going to Atlantic shareholders as a result of the merger will be $3.00. Any remaining payment is subject to prejudicial variables that may impact class members for years. Stated Neal Greenberg of *Seeking Alpha*, "It seems to me that any price currently above $3.50-$3.75 for ACFC common stock seems like a gamble, as what part of that $2 to be returned to you, after at least one year, remains very unsure."

57.     In addition, given the reliance on the Discounted Cash Flow ("DCF") Analysis and the failure to disclose any projections at all, the additional failure to provide any information regarding how KBW accounts, if at all, for the approximately $45 million of Net Operating Losses ("NOL") further illustrates the inadequacy of the $3.00 price.

58.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition and the Proposed Acquisition is the product of the Board's breaches of fiduciary duty, aided and abetted by Bond and Atlantic.

## THE PROXY OMITS MATERIAL INFORMATION

59.     On March 27, 2012, Atlantic filed a Proxy statement with the SEC. As set forth below in detail, the Proxy omits material information about the Proposed Acquisition that must be disclosed to Atlantic's shareholders to enable them to make a fully informed decision. This omitted information, if disclosed, would significantly alter the total mix of information available to them.

**A.** **The Proxy Fails to Provide Adequate Information Concerning the Process That Led to the Proposed Acquisition.**

60.     The Proxy omits material information with respect to the process and events leading up to the execution of the Merger Agreement, including:

a.      Whether the confidentiality agreements entered into with 18 parties included standstill agreements and, if so, if the terms of each standstill agreement was the same for each of the 18 parties.

b.      The criteria used by KBW beginning in December 2011 to determine which parties had a "reasonable likelihood of receiving regulatory approval to complete a transaction."

c.      The reasons provided by Party C in January 2012 that it was no longer interested in continuing the process.

d.      The specifics of the "alternative transaction structure" KBW discussed with Party B and "three other potential candidates" in March 2012 and the identity of the "three other potential candidates."

e.      The reasons provided by Party B in April 2012 that it was no longer interested in the process.

f.      The specific terms of the up to $2.00 CVR negotiated with Party D in and around June 2012, including the specific assets that would be subject to the CVR.

g.      The reasons the Company entered into a 60 day exclusivity agreement with Party D in June 2012 and the reasons provided by Party D on June 27, 2012 for not continuing with the process.

h.      The specific difficulties of "securing the standby investors necessary to complete a rights offering" discussed by the Board in August 2012.

i.      The specific concerns raised by Board members at the October 2012 Board meeting regarding the ability of the recapitalization in the form of a rights offering to raise enough capital and the specific reasons why certain Board members did not believe it would receive regulatory approval.

j.      The specific terms of the up to $2.00 CVR negotiated with Bond in and around November 2012, including the specific assets that would be subject to the CVR.

23

k.    Regarding the November 2012 Board meeting - the number of Board members, and identity of same, that constituted the "majority" expressing concern that the recapitalization proposal had "too much execution risk" and what concerns that majority had with respect to a "timely" approval by regulators.

l.    Regarding the November 2012 Board meeting - the result of Atlantic's legal counsel seeking input from the regulators as to the feasibility of receiving regulatory approval for proposed standby investors in a rights offering.

m.    Regarding the December 17, 2012 Board meeting – (i) what were the concerns raised by Board members regarding the "viability of the CVR," and (ii) what was the uncertainty raised by KBW with respect to Bond agreeing to a 60-90 day delay.

n.    The names of the four board members who voted at the January 28, 2013 Board meeting to pursue both the Bond proposal and the rights offering recapitalization plan.

o.    Regarding Bond's February 2013 revision of consideration - the Proxy fails to give any explanation for the change in structure from a $2.00 CVR tied to asset performance to a $2.00 escrow tied to stockholder claims relating to the merger, including whether the $2.00 CVR related to asset performance was subsumed within or retracted from the final $3.00 offer.

**B.    The Proxy Fails to Provide Adequate Information Concerning the Company's Financial Advisor.**

61.    The Company's financial advisor, KBW, was retained to render an opinion that the merger price is fair to the shareholders, and to perform the valuation analysis necessary to support that opinion. In light of the materiality of this opinion and analysis to the market and Atlantic's shareholders, it is critical to know any facts that might suggest that the financial advisors are conflicted. The Proxy is false and misleading for failing to disclose:

a.    details about any work KBW (or Stifel Nicolas) has done for Bond in the last two years;

b.    any fees paid or owed by Bond to KBW;

c.    what portion of KBW's fee is contingent upon the successful completion of the Merger;

d.      how much compensation KBW (or Stifel Nicolaus has received during the past two years for work it has provided to Atlantic, and what those fees were paid for; and

e.      any potential conflicts of interest between KBW (or Stifel Nicolaus) and Bond, including but not limited to the fact that Bond's Chairman Dan Healy was also a board member of a company Stifel Nicolaus was acquiring.

**C.      The Proxy Fails to Disclose Sufficient Details Concerning Stifel Nicolaus' Fairness Opinion.**

62.      In the Proxy, KBW describes its fairness opinion and the various valuation analyses it performed to render its opinion.  However, KBW's description fails to disclose necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion:

*Selected Public Companies Analysis* (Proxy at 28-30)

1.   The individually observed metrics and multiples for each of the selected companies, including:

a.   Return on average assets
b.   Core return on average assets
c.   Return on average equity
d.   Core return on average equity
e.   Net interest margin
f.   Fee income/operating revenue ratio
g.   Efficiency ratio
h.   Tangible common equity/tangible assets
i.   Total capital ratio
j.   Loans/deposits
k.   Loan loss reserve/loans
l.   Nonperforming assets/assets
m.   Net charge-offs/average loans
n.   Stock price/book value per share
o.   Stock price/tangible book value per share
p.   Dividend yield
q.   LTM dividend payout ratio

2.  Whether any other metrics or multiples were observed for the comparable companies, other than those currently listed in the Proxy. If so, what were those additional individually observed metrics and multiples?

3.  The source of the financial data used by KBW for the comparable companies, as it appears that Community Bank of South Florida and Georgia Bancshares have never filed financial results with the SEC, and Community First Bancorporation and Southeastern Banking Corporation have no financial results filed with the SEC since the first quarter of 2012).

*Selected Transactions Analysis* (Proxy at 30-31)

1.  The individually observed metrics and multiples for each of the selected transactions, including:

    a.  Transaction price/tangible book value
    b.  Transaction price/core deposit premium
    c.  Transaction price/market premium

2.  Whether KBW observed additional metrics and multiples for the transactions, other than those currently listed in the PREM14A, as it had for the Selected Companies Analysis? If so, what were those individually observed metrics and multiples? If not, why not?

*Discounted Cash Flow Analysis* (Proxy at 31)

1.  How KBW determined the terminal earnings multiple of 12.0x – 16.0x.

2.  Whether any adjustment was made for non-cash items in calculating dividendable cash flow for this analysis.

3.  What were the specific inputs and assumptions used to determine the discount rate range of 15.0%-19.0%?

4.  The implied perpetuity growth rates observed from this analysis.

5.  How, if at all, KBW accounted for the value of NOLs as part of its analysis.

**D.**     **The Proxy Fails to Disclose Certain Material Information Concerning Atlantic's Financial Projections**

63.     The Proxy fails to disclose certain material financial information concerning Atlantic. In particular, the Proxy fails to disclose the financial projections provided by Atlantic and relied upon by KBW for purposes of its analyses, for fiscal years 2013-2018, for all line items provided.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

64.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to act in the best interests of the company's shareholders, including the duty to obtain maximum value under the circumstances. To diligently comply with these duties, the directors may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties; and/or

(d)     will provide the directors, executives or other insiders with preferential treatment at the expense of, or separate from, the public shareholders, and place their own pecuniary interests above those of the interests of the company and its shareholders.

65.     In accordance with their duty of candor and duty to maximize shareholder value, the Individual Defendants, as directors and/or officers of Atlantic, are obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

66.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public shareholders of Atlantic, including their duty of candor and duty to maximize shareholder value. As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Atlantic common stock in the Proposed Acquisition.

67.     As a result of these breaches of fiduciary duty, the Company's public shareholders will not receive adequate or fair value for their common stock in the Proposed Acquisition.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Rule 2-231, individually and on behalf of all holders of Atlantic common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

69.     This action is properly maintainable as a class action because, *inter alia*:

(a)     The Class is so numerous that joinder of all members is impracticable. Atlantic's stock is publicly traded on the NasdaqGM and Plaintiff believes that there are hundreds if not thousands of holders of such shares. Moreover, the holders of these shares are geographically dispersed throughout the United States;

(b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. These common questions include, *inter alia*: (i) whether the Individual Defendants have engaged in self-dealing, to the detriment of Atlantic's public shareholders; (ii) whether the Proposed Acquisition is unfair to the Class, in that the price is inadequate and is not the fair value that could be obtained under the circumstances; (iii) whether Bond aided and abetted the Individual Defendants' breaches of fiduciary duty; and (iv) whether the Class is entitled to injunctive relief and/or damages as a result of the wrongful conduct committed by Defendants;

28

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(e)     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST COUNT

## CLAIM FOR BREACHES OF FIDUCIARY DUTIES BROUGHT DIRECTLY ON BEHALF OF PLAINTIFF AND THE CLASS

### (Against the Individual Defendants)

70.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

71.     As alleged herein, Defendants have initiated a process to sell Atlantic that undervalues the Company.  In addition, Defendants failed to sufficiently inform themselves of Atlantic's value, or disregarded the true value of the Company, in an effort to benefit themselves. Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and board that is committed to the Proposed Acquisition.

72.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will

further a process that inhibits the maximization of shareholder value and the disclosure of material information.

73.      Plaintiff and the members of the Class have no adequate remedy at law.

## SECOND COUNT

## CLAIM FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES BROUGHT DIRECTLY ON BEHALF OF PLAINTIFF AND THE CLASS

### (Against Defendants Bond and Atlantic)

74.      Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.      Defendant Bond knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Acquisition, Bond obtained sensitive non-public information concerning Atlantic's operations and thus had the advantage to acquire the Company at an unfair price.

76.      As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

77.      Plaintiff and the members of the Class have no adequate remedy at law.

## THIRD COUNT

## FOR DECLARATORY RELIEF PURSUANT TO COURTS AND JUDICIAL PROCEEDINGS ARTICLE OF THE ANNOTATED CODE OF MARYLAND § 3-401, ET SEQ.

### (Against All Defendants)

78.      Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

79.     Defendants breached their fiduciary duties in connection with the Proposed Acquisition, and/or aided and abetted such breaches, and are liable therefore.

80.     As a result of Defendants' conduct as herein alleged, Plaintiff and the other members of the Class have suffered and/or will, in the future, suffer damages and harm, including harm for which they have no adequate remedy at law.

81.     Pursuant to Courts and Judicial Proceedings Article of the Annotated Code of Maryland §3-412, Plaintiff demands a declaration that: (a) shareholders should not be asked to vote on the Proposed Merger, and that such vote should be enjoined; (b) Defendants and each of them have committed a gross abuse of trust and have breached their fiduciary duties owed to Plaintiff and the Class and/or have aided and abetted such breaches; (c) the Proposed Acquisition was entered into in breach of Defendants' fiduciary duties and was therefore unlawful and unenforceable, and that the Merger or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition should be rescinded and invalidated; and (d) the Proposed Acquisition, the Merger and/or the transactions contemplated thereby, should be rescinded and the parties restored to their original position.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.      Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B.      Declaring and decreeing that the Proposed Acquisition was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable, and

31

rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition;

C.     Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from soliciting shareholder votes on the Proposed Acquisition;

D.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Atlantic's shareholders;

E.     Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

### FOURTH COUNT

### CLAIM FOR BREACHES OF FIDUCIARY DUTIES BROUGHT DERIVIATIVELY ON BEHALF OF ATLANTIC COAST FINANCIAL CORPORATION

#### (Against the Individual Defendants)

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.     Plaintiff brings this action derivatively in the right and for the benefit of Atlantic Coast Financial Corporation to redress injuries suffered and to be suffered by Atlantic Coast Financial Corporation as a result of the breaches of fiduciary duty and other violations of law by the Individual Defendants.

84.     Plaintiff incorporates all of the allegations in this Complaint as if they were fully set forth herein.  Plaintiff has been a shareholder of Atlantic Coast Financial Corporation at all times relevant hereto has been, and continues to be a shareholder of Atlantic Coast Financial Corporation. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights. Plaintiff has retained counsel experienced in these types of actions to prosecute these claims on the Company's behalf.

85.     Any demand made by Plaintiff to the Board to institute this action would be futile and is excused. Based on all the allegations in this Complaint and Defendants' actions to date, including refusal to protect the interests of Atlantic Coast Financial Corporation and its stockholders, such demand would be a futile and useless act.

86.     Each of the directors of Atlantic Coast Financial Corporation have directly participated in the wrongs complained of herein, which disables them from acting independently, objectively and in good faith to advance the interests of Atlantic Coast Financial Corporation or respond impartially to a demand by stockholders.

87.     A majority, if not all, of the Atlantic Coast Financial Corporation directors are so personally and directly conflicted and/or committed to consummating the Proposed Acquisition that they cannot reasonably be expected to respond to a demand in good faith.

88.     Each of the Individual Defendants served on the Board during the relevant period, and as Board members accordingly were charged with oversight and operation of the Company and the conduct of its business affairs. Each of the Individual Defendants breached their fiduciary duties owed to Atlantic Coast Financial Corporation and its stockholders in furtherance of their plan to protect and advance their own interests, at the expense of and to the detriment of Atlantic Coast Financial Corporation and its public stockholders. Among other things, the Individual Defendants have agreed to

33

sell the Company at an unfairly low price and, in addition, have locked the Company into this unfair deal with preclusive deal protection devices that effectively guarantee that no higher bidder will emerge.

89.    The Individual Defendants have not exercised and cannot exercise independent or objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of the directors has participated in and approved the misconduct alleged herein.

90.    Further, as described herein, a majority (if not all) of the Individual Defendants have clear and material conflicts of interest and are acting to better their own interests and the interests of Atlantic Coast Financial Corporation's other senior managers at the expense of the Company and its public shareholders.

91.    The Individual Defendants have demonstrated their unwillingness to act in compliance with applicable law or to sue themselves and/or their fellow directors and executives for failure to do so, as they have developed professional relationships with their fellow board members and senior officers who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

92.    Demand is also excused because Atlantic Coast Financial Corporation would be irreparably harmed if the shareholder vote on the Proposed Acquisition was permitted to proceed without first affording the relief requested herein. Under applicable Maryland corporate law, demand is excused where, as here, a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation.

93.    A delay in awaiting a response to a demand would cause irreparable harm to Atlantic Coast Financial Corporation.

94.   The Individual Defendants have violated the fiduciary duty of candor and their fiduciary duty to maximize shareholder value, and have acted to put their personal interests ahead of the interests of Atlantic Coast Financial Corporation and its shareholders.

95.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Atlantic Coast Financial Corporation and its shareholders of Atlantic Coast Financial Corporation's true value.

96.   The Individual Defendants have violated their fiduciary duties by entering Atlantic Coast Financial Corporation into the Merger Agreement without regard to the effect of the Proposed Acquisition on Atlantic Coast Financial Corporation and its shareholders.

97.   By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Atlantic Coast Financial Corporation, Plaintiff and the other members of the Class.

98.   As a result of the Individual Defendants' unlawful actions, Atlantic Coast Financial Corporation and its shareholders will be irreparably harmed in that they will forever be denied the fair value of the Company's assets and operations. Unless the shareholder vote on the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to the Atlantic Coast Financial Corporation and its shareholders, will not engage in arm's-length negotiations on the Proposed Acquisition's terms and may consummate the Proposed Acquisition, all to the irreparable harm of the Company and its shareholders.

99.   Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Atlantic Coast Financial Corporation and its shareholders be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

35

100.   Atlantic Coast Financial Corporation is sued nominally and named herein as a nominal defendant for this derivative claim.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor and in favor of the Class, and against the Individual Defendants, on the Fourth Cause of Action, as follows:

A.   Declaring that this action is properly maintainable as a derivative and class action, certifying Plaintiff as Class and derivative representatives and certifying his counsel as class and derivative counsel;

B.   Declaring that shareholders should not be asked to vote on the Proposed Acquisition, and that such vote should be enjoined;

C.   Declaring that the Individual Defendants and each of them have committed a gross abuse of trust and have breached their fiduciary duties owed to Plaintiff and the Class and/or have aided and abetted such breaches;

D.   Declaring that the Proposed Acquisition was entered into in breach of the Individual Defendants' fiduciary duties and was therefore unlawful and unenforceable, and that the Proposed Acquisition or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition should be rescinded and invalidated;

E.   Declaring that the Proposed Acquisition, the Merger Agreement and/or the transactions contemplated thereby, should be rescinded and the parties restored to their original position;

F.   Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits, property or value improperly received by Defendants and/or traceable thereto and/or in the possession of any of the Defendants as a result of their wrongful conduct;

G.   Enjoining Defendants, their agents, counsel, employees and all persons acting in

concert with them from soliciting shareholder votes to consummate the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

     H.    Rescinding, to the extent already implemented, the Proposed Acquisition or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

     I.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

     J.    Awarding compensatory damages in favor of Plaintiff against all Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

     K.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

     L.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

Dated: April 4, 2013

BROWER PIVEN
  A Professional Corporation

Charles J. Piven
Charles Noah Insler
Yelena Trepetin
1925 Old Valley Road
Stevenson, Maryland 21153
T: (410) 332-0030
F: (410) 685-1300

*Attorneys for Plaintiff*

OF COUNSEL:

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc Ackerman
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
T: (610) 667-6200

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of April, 2013, a copy of the Amended Complaint

and a comparison copy were served *via* U.S. mail, postage prepaid, and email upon:

Erik Bilik
McGuireWoods LLP
Bank of America Tower
50 North Laura Street
Suite 3300
Jacksonville, FL 32202-3661
Email: ebilik@mcguirewoods.com

*Counsel for Defendants Atlantic Coast Financial Corporation
and the Individual Defendants*

Peter Smith
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Email: psmith@kramerlevin.com

*Counsel for Defendant Bond Street Holdings, Inc.
and Florida Community Bank, N.A.*

---

Yelena Trepetin